Case No. 17-5084 Delaware Riverkeeper Network et al. appellants v. Federal Energy Laboratory Commission et al. Mr. Yager for the appellants, Mr. Colton for the appellees, Mr. Marwell for intervener and appellee pipeline, and Ms. Patterson for Amicus Curiae, United States of America. Good morning, Your Honors. May it please the Court. Let's just wait just a second. We're honored to have some high school students from Maine with us today. They're coming in. Go ahead and sit down first. We'd offer you a seat on the bench, but that's not appropriate. So we're glad you're here. Okay. We can proceed. Thank you, Your Honors. May it please the Court. Jordan Yager on behalf of appellants, Delaware Riverkeeper Network, and Maya Van Rossum on joint counsel table by Aaron Stempelitz. I already asked the clerk if I could reserve four minutes. I'd like to do that. Your Honors, this is a case involving a federal agency that has been operating under the 1986 Budget Act as a truly entrenched bureaucracy that has a dramatic impact on people's lives. Under the Budget Act, FERC is dependent on continuing to approve pipeline projects for its long-term funding. That is the natural gas program within FERC receives 100% of its budget through those continued approvals. And the courts have been clear, going back to the Supreme Court in Roth, that in order to determine whether we have a protected property interest or liberty interest that is protected by procedural due process, we look to establish state rules and we look to see what are entitlements under including federal, but we look also to state law and established rules under state law for what are entitled benefits under state law. Within that, we look to, for this case, then we look to the Pennsylvania Constitution. And Pennsylvania's Constitution is... Let's start maybe with the back side of this. Yes, sir. The due process for our argument. So I'll anticipate the United States, as you know the United States has appeared in here and is arguing that under your argument, I believe there are 25 agencies that would have to do things much differently than they're doing now. That's a pretty broad swath you're cutting. Would you care to respond to that argument? Well, two or perhaps three responses, if I may, Your Honor. The first is that we don't judge constitutionality by whether an act is unconstitutional. We don't say an act is constitutional simply because a lot of people are doing it. We have to assess constitutionality pursuant to established jurisprudence. But we do, to some extent, look to history and practice in deciding what processes to use. So if this kind of funding mechanism is widespread and has been longstanding, that cuts against you. Well, we haven't had a case. So the other two parts of my answer, and I acknowledge that part of the analysis in determining what the processes do, and all that we're asking for here, to be clear, is an unbiased adjudicator. But the notice and opportunity to be heard issues are not issues that we've raised. With regard to the question of 25 other agencies, we've addressed in our brief a breakdown on how we perceive the differences among those agencies. And we think that what the Court is left with is one or two agencies, most notably the Nuclear Regulatory Commission. I know one of our amici pointed to the patent system. But what we have here, if we are going to look at the question of 25, what we have here is a unique agency because of the combination of the adjudicative and executive functions. So not all the agencies that they point to that receive funds receive those funds as part of an adjudicative process. Secondly, not all those agencies that receive funds receive the same proportion of their funding here. And, again, the Natural Gas Program, in particular, receives 100 percent of its funding from the approvals. So it's not simply an application fee. There's a difference between saying we get funding from people who appear in front of us. It's specifically tied to the approvals. And that makes this relatively unique. The gas pipelines are 20 percent of what FERC does? The Natural Gas Program is 20 percent of the overall budget. And does the other 80 percent of FERC work the same way? It's my understanding, and I'm not as well versed in those pieces, but it's my understanding that they are also user-funded but not as directly, that the budget implications are not. This starts with an appropriation from Congress, however. This is a reimbursement to the Treasury appropriation, right? It is. And isn't that significantly different from the cases that you've cited? Well, it's significantly different from the – we think that the facts in this case are significantly different from any of the cases that have been decided to begin with, on both sides. And this is why we say that you have to look at the practical effect. And the district court made a determination that we believe was really a determination that couldn't be made as a matter of law, which is that the budget numbering is too attenuated and there's no immediacy. And that's what the district court relied on in saying, therefore, we're not going to see this as a problem. We're not going to see the bias as a problem. The reality, and we believe that that's a fact question that needs to be decided with a full factual record, because the court's required to consider the practical effect of the budget process. When one looks at how the budget process has actually played out, Your Honor, FERC has submitted budget requests. It's able, because of its long-term funding from approvals, it's able to project out what its funding needs. It faces ever-increasing costs. And so its budget has continued to rise, something like 51% over the last 10 years. By our calculation, 99% of its budget requests in the 30-year period that it's operated under this Budget Act, 99% of its budget requests have been granted. The United States has pointed to two examples where there has been differences. We address those differences in our briefing, and we suggest that there are differences without a distinction, that really, in the end. Is that the way to approach it? I mean, you're saying because FERC has been successful, therefore, there must be some showing of structural bias. Is that it? I thought the law, the case law has asked us to look at whether the structure creates an improper influence. A possible temptation for bias. Yeah, a possible temptation. That's right. But I'm answering the charge that, well, because Congress appropriates, there is no possible temptation. And our answer on the possible temptation, Your Honor, is that these are projects of limited lifespan. So the Penn East project that this case was kind of framed around, when they submitted, they said they have a 40-year lifespan for their project. You look at two aspects of it. You look at the structural integrity, the long-term structural integrity of the pipes. You also look at the contracts because they, in part, get approved based on the contracts that they've been able to sign. Here, Penn East just says they have a 15-year contract. So unless there is that continuing, the possible temptation lies in the fact that unless there is a continuing approval of these projects, ultimately, there will be no more funding for available for the agency. Because while Congress appropriates, Congress requires, then, under the Budget Act, FERC to go back and collect it. The pivotal factual question, I think, in this is the argument, well, FERC can just keep raising the rates. FERC can just keep upping the charges because the charges get spread out among the regulated entities. The problem with that in this court, Judge Griffiths was on the no pipelines case decision. This court in the no pipelines was a case where, in the context of it, there was a challenge to the certificate that raised this biased adjudicator question. And the court said that's not properly brought in a challenge to a FERC certificate. That should be brought by way of a constitutional challenge to the Budget Act, which is what we have done here. One of the reasons the court said that's the appropriate mechanism is that there may be factual issues that need to be established. One of the factual issues that the court noted is that there is a threshold at which those costs can be passed on to the consumers, meaning to the pipeline companies, before the profitability dries up. What's your best case? You're asking us to go way beyond the Supreme Court cases where either the adjudicator gets more money upon imposing a fine, or the adjudicator has executive responsibilities and the entity gets more money if it imposes more fines. You're saying, well, neither of those is true, but maybe in the long run, if they have more pipelines, they'll be able to ask Congress for more money and such. It seems like to the extent there are any cases addressing those very diffuse and long-term issues, they all seem to cut in the government's favor, Benitez and Doolin and cases like that. Do you have anyone that finds a structural due process problem on similar structures? Yes and no, Your Honor. I think the answer to the first part of your question is what do I think are strongest cases. I actually think it's the Supreme Court's decision in Ward. And the reason why is not because in any of these cases, as I said, I don't think in any of these cases do we see a fact pattern such as it is that aligns up. I think what we see are statements of principles that guide the court in the decision-making on a biased adjudicator, and we see those statements laid out in these various different cases. What are the statements of principle that you think apply here? They're really hard to grasp. What is the draw for the agency that somehow reflects or gives vent to bias? In Ward, the money from the $50 that the mayor that was generated by fines in Ward didn't go to direct pecuniary benefits. It comes into the city's coffers. The more fines imposed, the more money the city has, and the mayor has executive responsibilities for the fundraising, the budgeting. And that was where the fines accounted for a third of the city's budget. Well, make the connection now. I don't see the connection. Your Honor, here we have an institution that unless it continues to grant approvals, its funding source will dry up, period. They'll have no fundings to exist at all? That's correct. Or just with respect to this segment? No, none at all. None. None, because the pipelines have limited lifespans. And so if 30 years ago, 40 years ago, there was a rash of approvals and its funding source is those pipelines, and those pipelines are no longer operable because they haven't continued to replenish their pool, they haven't continued to replenish the source of funding by continuing to approve pipelines, then they don't have entities to pass their charges on to. And FERC will go out of existence? Yes. There's nothing else that FERC does? No, I'm talking about the natural gas program. That program. The natural gas program would go out of existence. Absolutely. A piece of FERC's program will go out of existence? Yes, Your Honor. How does an agency person think to cause her or him to worry about that? In biased terms, I'm not getting it because there's so much other work to be done. First of all, it seems utterly unrealistic, but let's assume it's a reality, and this administrator says, oh, wow, all of our pipeline business is going to be lost. I better collect these fees. Why? Why do these people come and go? What do they care? It's not like a mayor being elected in a town. Well, the court, for example, in the Alpha Epsilon Phi Tau case, said that there's a recognition of institutional responsibilities. In fact, we can expect that all of the genuine public servants at FERC, both at the staff level and the commissioners themselves, have act with a sense of fiduciary responsibility for their agency. We should presume that. We should presume. Which means we should presume that they're acting honestly and applying the law. We should. And not granting certifications that are unjustified. But as part of that, they have an obligation to their institution. The court has to recognize, and the courts have historically recognized, that people who are in charge of institutions act with a sense of institutional responsibility. That is an issue that is dependent on that institution's continued existence. If they leave with less existence, then they have undermined their institution. I'm sorry, your Honor. What's the lifespan of a pipeline? It's been projected as up to 40 years. Lifespan of a FERC commissioner is five years? The fact that there is a – and I see that my time is running. The fact that it is spread out over time doesn't make the math any more real. No, but the fact that this problem, if any, happens on a 20-, 30-, 40-year time horizon suggests, if you're a rational FERC commissioner thinking what's going to happen here, the prospect of Congress just letting pipeline regulation go out of existence for lack of funding seems pretty implausible. Well, that gets to – it seems to me, your Honor, that gets to, in some ways, answering the first question that the court raised, which is should we be concerned about the practical effect of finding this unconstitutional because it may disrupt the funding sources. The point that your Honor makes can be applied equally to that concern and say, fine, then find another – we'll find another way to fund it. It doesn't mean that the program has to shut down. If Congress had said that we think this is so important, we're going to balance it against tax increases. We're going to balance it against other budget priorities. Congress could do that. But right now the reality is we're operating under a system where Congress doesn't have that natural incentive that it has in its other budget decisions about how to weigh things. And the impact we can see quite starkly in 100 percent approval ratio for projects that have come before FERC for a vote. Mr. Reardon, we did want to give you time back, but if my colleagues don't have any further questions, we'll – all right. Thank you. Thank you, Your Honor. Thank you, Your Honors. Ross Fulton for the commission. Your Honors, as the district court – How long do you plan on being at the commission? Hopefully they'll continue to have me, Your Honor. Your Honor, the bottom line, and to your point, as the district court found here, the commission cannot be structurally biased as a matter of law because the commission does not control its budget. Instead, Congress controls its budget and sets it through appropriations. Congress in the Budget Act simply instructed the commission to recoup its fixed costs or user fees. Approving or denying a pipeline does not change or increase the funding available to the commission. Those funds are simply deposited in the treasury, and any over-recoveries, in fact, return to the companies. This is, as the court discussed earlier, similar to how 25 other agencies have received user fees to recoup their costs. In fact, the Supreme Court in Skinner considered it a somewhat separate challenge to user fees that the Department of Transportation was collecting and found that Congress was well within its authority to authorize that agency to collect those user fees and that ultimately Congress still exercised control over that funding scheme. Instead, this case is much more analogous. Let me ask you, so Mr. Yeager's point is I think that at least perhaps at the margins at least, doesn't the fact that FERC relies upon these fees, doesn't that at least at the margins have some impact on the decision of whether to grant or deny? Again, the hypothetical, if you have, you know, if all the pipelines are 40 years old and they're all going to die, at the margins doesn't that have some impact? I don't think so, Your Honor, for several reasons. The first, as Mr. Yeager recognized, the commission and its staff are under a fiduciary duty to act. The court's given the presumption of honesty and integrity, and the commission's primary role is to administer the Natural Gas Act and its attendance statute. There's a lot of scholarship out there about captive agencies and things like that. Are we to disregard that? Well, yes, Your Honor, because the other reason is to the point of the plausible standard. It's problematic that in the one hand Riverkeeper's saying that the commission is ever growing because it keeps approving these pipelines, and yet on the other hand is positing that they may all go offline next year. But even putting that aside, let's say that situation did occur. The far more likely scenario is to drastically simplify the commission's approval situation. The commission assesses a pipeline, determines whether there's adequate market demand for the gas that's being shipped on the pipeline, and considers whether it can be safely and reliably operated consistent with environmental and local community standards. So if a bunch of pipelines are going offline but there remains demand for natural gas from customers, likely what is going to occur is that new companies are going to bring pipeline applications, and the commission is going to be busy assessing those applications, which ultimately when one looks at the budget requests of the commission or the appropriations, which are both publicly available and subject to judicial notice, is what the commission's appropriations are based on. How do you respond to Mr. Yager's point about the track record of FERC on these that seems like pipelines win all the time? A couple points, Your Honor. As this court recognized in no gas pipeline, the quote unquote approval rate isn't actually indicative of what's occurring because as a company goes through the commission's process, through the pre-filing process, through the environmental review, through the interactions with local landowners and communities, projects that are unlikely, as this court recognized, to receive funding are not going to continue to put in the time, the cost, the effort to continue to seek and pursue those applications until the very end. The second point is that the commission has in fact denied applications. For instance, in Jordan Cove in 2016, the commission found that the need for the project was outweighed by the adverse impacts on the local landowners and communities. And the final point, as this court has repeatedly recognized, is that the commission has broad authority to attach a host of terms and conditions to pipelines. So even when projects are approved, they rarely, if ever, look as they were originally applied for. The commission uses its authority to shape and mold those projects to ensure that they can be operated safely and in an environmentally sound way. And the final point I would make, Your Honor, is that to the point that the commissioners are all seeing this need or this bias to do it, the commissioners don't always agree. In fact, in the Penney's case that was mentioned earlier, there was three separate opinions, two concurrences and one dissent that would have denied the project. So far from being some sort of uniform, all commissioners moving in the same direction, there's actually shows that the commissioners are acting on their honesty, integrity, and trying to do the best job they can for us. Why don't you talk a little bit about their challenge to the tolling orders? Sure, Your Honor. I think this no-gas pipeline is instructive here with the problem with bringing this sort of facial challenge to tolling orders in this context. No-gas pipeline instructed that cases that are brought under the Natural Gas Act must be brought through the Natural Gas Act's judicial review provision. So as Your Honors are familiar, in a standard commission case that is going through seeking a commission rehearing and then bringing a case under 717R. The reason that we're here is because, as the court found in no-gas, the Budget Act is obviously separate from the Natural Gas Act. But the challenge to the commission's use of tolling orders is a challenge to how the commission is administering the Natural Gas Act and whether it's abiding by what 717R requires. So I would argue, first off, that we are in the wrong court for such a challenge and that it should be brought through the course of business. As Penny pointed out in a recent 28-J letter, they, in fact, have raised a similar challenge in the actual Penny's proceeding, and that would be the proper forum for bringing such a challenge. And the second thing I would note, Your Honor, is that the commission's use of quote-unquote tolling orders to extend the time to consider rehearings have been universally upheld both by this court and by other courts just last week by the Sixth Circuit. And because I think that beyond the fact that the plain language of the statute says act, not act on the merits, for instance, with the Penny's proceeding, if you will, there's over 40 rehearing requests, totaling thousands of pages. So to our earlier discussion of for the commission to be able to do its job and conduct itself to faithfully administer the statutes that it's entrusted to do so by Congress. Has anyone ever went? On rehearing? No. I do not. Yes. There are certainly cases where the commission has granted rehearing requests. That would address the concerns that they're raising. That would address the tolling order concerns? Well, I obviously can't speak for what the commission would say on rehearing to their request, but in a hypothetical, if the commission denies their request, obviously they can bring that challenge to this court and have this court determine whether the commission's use of tolling orders. I mean, the problem they're raising is while this is all going on, the commission has allowed the project to continue, to start and move along, which is affecting their property rights. And I understand that, Your Honor. And that's, if I may jump back a little bit to the Jordan Cove example where the commission denied the application, the commission is well aware that Congress in setting up the Natural Gas Act has given automatic right for a project to start. So it's cognizant of that. And one of the reasons it denied the application in Jordan Cove was that it did not want to let a project go forward. It didn't see sufficient need for it when it would have immediate effects. But I would say also that the riverkeeper obviously is within its rights to seek a stay of any individual application and to seek a writ of mandamus if it believes a project. Did they ever win any of those? No, Your Honor. We have been successful. I mean, that's what they're saying. It's not a viable option, at least based on history. I certainly understand, Your Honor. And I think, though, in this court, the problem with their challenge in the present case is that they're just challenging tolling orders per se. I think there would be a big difference if it was a tolling order for a day or a month versus a tolling order for several years while the project is complete. Obviously the commission works as hard as it can to process rehearing applications in an efficient manner. But I think that's why a tolling order case would be more properly brought with, for instance, the Penney's application, where a party could say the commission has stayed this for six months and look at all this construction that's gone on. And obviously a party also can challenge, as this court just held last year, can obviously challenge any individual letter orders from the commission. And those applications for a stay or a writ of mandamus, that comes to us, right? That's correct, Your Honor. So that's the courts having granted. Correct. And, yes, Your Honor. But this court has recognized its inherent authority in furtherance of its jurisdiction if an agency is taking too long or delaying to grant a writ of mandamus. If there's not any further questions, thank you. Thank you very much. We'll hear from the intervener. Thank you, Your Honor. May it please the Court, Jeremy Marwell for intervener, Penney's Pipeline Company. We agree that the question of this case is most straightforwardly resolved on the question of whether there is a possible temptation on the bias issue. And with respect to the first question the Court asked, the appellants, of course the theory advanced here does not only affect federal agencies but state and local government as well because it's advanced under the Federal Due Process Clause. In terms of the potential need for factual development, courts have and do resolve these claims on the pleadings. You can look at the Van Harken case from the Seventh Circuit, which was a 12B6. The Mallinckrodt case cited in the amicus brief, also a 12B6. And I think you can do that because of the allegations in the complaint as the Court is recognizing its questions. Complaint Paragraph 122, pipelines last for 40 years. Complaint Paragraph 139, Penney's has a 15-plus-year contract. And you can also, of course, look at the plain language of the relevant statutes and regulations, which include the FERC regulation 154.402, allowing pipelines to pass through these charges to their customers. And that, in fact, is what FERC did in the rulemaking notice cited in the appellant's brief. When they were analyzing the size of the charge with respect to the industry, they addressed that by allowing the pipelines to pass them through. Ward is the best case in the appellant's view. In my count, it's the only case that recognized a structural bias claim that didn't involve some pecuniary interest or some ability to increase the coffers of the agency through a marginal decision. Of course, we don't have that here because it's proportional only. They're just decreasing or increasing the costs imposed on a particular pipeline. With respect to tolling orders, I would say Congress made a determination in the Natural Gas Act that the filing of a request for rehearing would not automatically stay the effectiveness of a FERC order. So to the extent things are allowed to move forward, that was at least in part a decision that Congress made. And we find it hard to understand how you can adjudicate a tolling order claim in the abstract without facts about how long the tolling order was in place and if anything was allowed to occur while the tolling order was in place. Finally, I would say the claim was not—if there is a facial due process claim, I think they needed to preserve it in the district court. And looking at the way the issues were briefed, I think they raised a statutory claim and a claim that somehow the tolling orders contributed to their structural due process claim, but I don't know that they raised a facial claim. If there are no questions. Thank you. Thank you very much. We'll now hear from the United States. Good morning. Good morning, Your Honor. May it please the Court. Melissa Patterson for the United States. I apologize. While I am here, parts of my voice have declined to appear this morning, so I apologize if I'm difficult to understand. Would you, Your Honor? Well, now you're teasing me, Your Honor. If this Court reaches this issue, the United States urges this Court to affirm the district court's conclusion that FERC's funding mechanism does not introduce unconstitutional structural bias. I think as this Court's questions recognized this morning, the claim here is far more generalized, goes far beyond what any court has used as a structural bias problem. Judge Griffith, you noted that we note that a number, several dozen agencies, impose various fees or assessments on their populations that they deal with. I don't want to suggest that they all necessarily rise or fall together. If somehow this Court did break some radical new ground on the structural due process front, the schemes are all different. Congress is acting in a fairly finely reticulated way. But I do want to emphasize that at the level of, given the breadth of the challenge here, if this Court were to find that the type of generalized interests that petitioners claim introduce unconstitutional bias did indeed state a claim, then there could be serious doubts about numerous federal agencies funding statutes. So do you have a suggestion for how we would write that more narrowly? I don't think that's what you were saying. I think this case, it can be resolved on, if the Court even reaches the structural bias issues. What do you do with Mr. Yeager's argument that the mere fact that it's been done this way for a while shouldn't resolve the constitutional issue? I don't think we're suggesting somehow that it's the history or the breadth of the number of times Congress uses these mechanisms is dispositive, certainly. But as the Court has recognized, as the Supreme Court emphasized in the Perales case and the Strata case, the way of doing business certainly is relevant to the analysis. I also want to emphasize that there were a number of statements this morning about somehow, as if the money from an approved pipeline, the fees assessed on them, were somehow directly increasing the money available to the Commission. That is simply untrue. Congress is responsible for setting, for expunging. Your argument is that it was increasing the amount of money. It was just giving them the money so they could operate. And without that money, they close shop. But the fees do not give them the money to operate. Congress does. By statute, all of the monies collected here flow into the general fund in the U.S. Treasury. And I note at various points they cite Judge Noonan's concurring opinion in the Earth Institute about the very, Judge Noonan, not shared by the rest of the panel, but in the concurrence indicated his concern about an agency's impartiality. Even he noted that if the monies collected through an agency's program went into the general fund, that should obviate any question of potential bias. The Court has no further questions. Thank you very much. Thank you. How much time did Mr. Kieger have? Okay, well, I think he had asked for four minutes. I had, Your Honor. And I think we ate that time up, so we'll give you back four minutes. Well, thank you, Your Honor. I want to make clear what we're asking for here is a remand to the district court. We believe that the district court was in error in deciding this matter as a matter of law on a motion to dismiss. And I think the questions this morning and the discussion with Learning Council just now highlights the benefits of that. One, we hear about plausibility. How plausible is it that the funding will run dry? Because that goes to the possible temptation of bias. The court below made a finding that the funding wasn't dry, the concept of the funding running dry wasn't imminent or tangible. That is exactly the type of conclusion that should only be made when there is a full record that's been established. I hear the Court's concern and I hear the United States' concern about how do we distinguish this from other agencies if we can. That's the type of consideration that would be fully explored through litigation and establishment of a record, to the extent that the Court deems that a necessary area of inquiry to be further established in discovery. No one can look at the complaint and assert as a matter of law that those issues weren't raised in the complaint. So to the extent that there are those factual issues, that would benefit from discovery, in addition to the question of plausibility, which was part of this Court's concern in the no-gas pipelines case. On the question of the tolling order, we very clearly in our complaint, and we cite to it repeatedly in the brief, but it's very explicit in paragraph 270 of the complaint, identify our concerns about the use of tolling orders as a separate and distinct basis for our due process claims. And it was a claim that wasn't addressed by the Court below. I can't help but think of the boardwalk whack-a-mole game, or at least in my generation it was a boardwalk game. Now it's probably a computer version when we're talking about the tolling orders. Because we keep on hearing, now's not the place, now's not the time, you've got to go do it somewhere else. And what we heard this morning was Delaware River Keeper Network ought to wait until this has been, until it's been tolled for a year or two, and there has been damages incurred, to come and raise their due process challenge over the use of tolling orders. Well, at that point, the liberty interest, the property interest have been lost. The reference to the Sixth Circuit decision that was made in the letter that was submitted to the Court and referenced again today, all highlights the fact that the courts have already said, we're going to consider the tolling orders proper under the Natural Gas Act. So challenging it in the context of a challenge to a FERC certificate doesn't provide an avenue for the Court to actually consider. We're saying that if the Natural Gas Act is going to be interpreted in a way that allows for these indefinite tollings, then that constitutes a violation of due process. It deprives the opportunity of residents who are subjected to significant risks to never having their day in court. And we've seen that in practice. Do you think that any tolling under any circumstances of any amount would be unconstitutional? Well, I think here we can see very clear contours in what Congress established in this context because of the nature of the rights and the nature of the judicial concerns to have the issues in front of the Court within 30 days. So that certainly provides a clear framework that we think the Court can operate in. Is that a yes? I'm sorry? Is that a yes? I don't know. It's hard for me to answer what the outer limits of that would be, Your Honor. Thank you very much. The case is submitted.
judges: Griffith, Katsas, Edwards